IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CHARLES RIVERA,
        Plaintiff,
-vs-

CAUSE NO.:
AU-16-CA-00549-SS

TOWNSQUARE MEDIA
BROADCASTING, LLC,
        Defendant.

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically, Defendant Townsquare Media Broadcasting (Townsquare)'s Motion for Summary Judgment [#39], Plaintiff Charles Rivera's Response [#40] in opposition, and Townsquare's Reply [#41] in support. Having reviewed the documents, the relevant law, the arguments of counsel, and the case file as a whole, the Court now enters the following opinion and order.

### Background

This is an employment discrimination and retaliation case. In the fall of 2013, Rivera was hired by Townsquare as a radio announcer for KOOC, a hip-hop radio station located in Temple, Texas. Mot. Summ. J. [#39-1] App. at 3; Resp. Mot. Summ. J. [#40-1] Ex. A at 2.[1] As a radio announcer, Rivera's primary on-the-job duty was to act as an announcer and "DJ" for KOOC. Resp. Mot. Summ. J. [#40-1] Ex. B (Rivera Decl.) at 2–4. In addition to these primary duties, Townsquare also required Rivera to author twelve short blog posts each week regarding current events and local news. *Id.* at 4. According to Rivera, a comparatively large proportion of KOOC's audience is black, and in his capacity as a hip-hop radio announcer, Rivera frequently

---
[1] For consistency, all citations refer to CM/ECF pagination.

1

brought black music artists into the studio to have them on air. *Id.* at 2–3; *id.* [#40-3] Ex. C (Wiederhold Dep.) at 12–13.

Rivera's local manager at the station was Laura Wiederhold. Wiederhold Dep. at 5–7. Though the first year of Rivera's employment apparently passed without incident, Rivera alleges that Wiederhold frequently complained to Rivera about his interactions with black men at the radio station. Rivera Decl. at 2–4.[2] At one point in 2015, Wiederhold called the police when she saw black men congregating outside of the radio station after dark. *Id.* Wiederhold explained in her deposition that she called the police because the black men were assembled at the radio station's front entrance and she was unaware anyone was expecting visitors. Reply Mot. Summ. J. [#41-1] App. at 1–19.[3] In actuality, the men had come to the station to meet with Rivera and were standing outside with him when Wiederhold called the police. Resp. Mot. Summ. J. [#40-1] Ex. I at 7.

Rivera alleges Wiederhold's racial animus extended beyond casual remarks to impact operational aspects of his work for KOOC. For example, Rivera alleges the other Townsquare radio stations were given more opportunities and better equipment with which to work because their audiences consisted of non-black listeners. Rivera Decl. at 3. At his deposition, Rivera also alleged Wiederhold interfered with his ability to enter contractual arrangements with black music artists by attempting to make Rivera charge KOOC's predominately black artists for playing their music or for interviews, despite the fact that this was not typically done for artists on other stations. Rivera Dep. at 7.

---

[2] In its reply, Townsquare alleges for the first time that none of Wiederhold's remarks can create a genuine issue of material fact because the remarks are inadmissible hearsay. Reply Mot. Summ. J. [#41] at 6. The Court nevertheless opts to consider Wiederhold's remarks because Townsquare does not explain why Wiederhold's comments do not constitute statements of a party opponent under FED. R. EVID. 801(d)(2).

[3] *Cf.* Resp. Mot. Summ. J. [#40-1] Ex. I at 7 (alleging Wiederhold "wasn't even in the building" but was instead "driving by the station" and called the police because she "saw three black men" with Rivera).

Eventually, Rivera complained to his operations manager, Vince Richards, about the unequal treatment he was receiving as the radio announcer at KOOC. Rivera Decl. at 3–4. Specifically, Rivera told Richards that Wiederhold, the local manager, was discriminating against Rivera because he was the announcer for the hip-hop station and because Wiederhold was afraid of black men. *Id*. Rivera alleges Richards was insensitive to these complaints and told Rivera to stop complaining. *Id*. Additionally, Richards allegedly told Rivera to be "careful" about having black men come to the station. *Id*.

Either prior to or simultaneous with Rivera's complaints of discrimination,[4] Tan Curtis, a digital managing editor for Townsquare, "began a campaign of concentrating on Rivera's blog posts" to detect potential plagiarism. Resp. Mot. Summ. J. [#40-1] Ex. A at 4. This alleged investigation revealed several instances of alleged plagiarism or shoddy attribution. Townsquare's motion for summary judgment identifies three instances in which Rivera allegedly plagiarized content produced by third parties. In the first instance, Rivera wrote a post which "featured a quote originally published by the New York Times." Mot. Summ. J. [#39] at 13. In the second instance, Rivera "borrowed multiple quotes" originally published in an AllHipHop.com article. *Id*. In the third instance, Rivera's post contained two sentences that "were nearly identical" to sentences in a TMZ article. *Id*.

On January 27, 2015, Tan Curtis and Vince Richards met with Rivera regarding Townsquare's plagiarism and attribution policies. Mot. Summ. J. [#39-2] Appendix at 230. Curtis explained Rivera should include attribution and hyperlinks in his blog posts when he gathered information from outside sources and also informed Rivera he should add a local or

---

[4] The timeline put forward in Rivera's statement of facts is not clear on this sequence of events. Tan Curtis began his 'targeted review' of Rivera's posts sometime in early 2015, and Rivera's statement of facts does not allude to any instances of alleged discrimination at Townsquare prior to 2015, nor does it indicate whether Rivera had voiced any complaints about alleged discrimination at that time.

3

personal spin when adapting posts written by Townsquare's national team. *Id.*[5] After the meeting, Curtis sent out an email which states "[o]ur concerns discussed, we look forward to a productive and creative 2015." *Id.* The email does not suggest Townsquare was considering terminating Rivera for his past conduct. *Id.*

On May 8, 2015, Curtis emailed Wiederhold and Stephanie McMaster, a regional digital manager and reported Rivera was "Plagiarizing Again (Sort of)" but that Rivera's transgressions were "not exactly plagiarism." Mot. Summ. J. [#39-3] Appendix at 19. Curtis explained that Rivera's posts did not actually constitute plagiarism but probably violated Townsquare's "proper attribution protocols." *Id.* at 27. Curtis believed the posts showed Rivera was intent on "trying to find . . . ways around putting in the effort required to complete his regular posting duties." *Id.* at 19. Wiederhold forwarded this email to Richards. Resp. Mot. Dismiss [#40-4] Ex. D at 20.

In a follow-up email on May 27, 2015, Curtis emailed Richards and McMaster ten collected examples of alleged plagiarism and shoddy attribution. Mot. Summ. J. [#39-3] Appendix at 19. Of these ten examples—drawn from over 600 blog posts authored by Rivera—only four were posted subsequent to the January 27 meeting. *Id.* Curtis's email acknowledges these four instances of alleged plagiarism were "more subtle" than on previous occasions, a development he attributes to "evolution" in Rivera's plagiarism technique. *Id.* Curtis further explained that if he could google a phrase from one of Rivera's articles and find another article using the same phrase, "that's plagiarism, plain and simple." *Id.*[6]

---

[5] *See also id.* at 234 (Feb. 5 Email) (explaining Rivera was "welcome to create [his] own posts based on content [he had] been made aware of through our national sites, especially if you have something personal or local to add to the conversation").

[6] Some of the allegedly plagiarized language cited by Curtis is exceedingly generic. For example, one of the four posts highlighted by Curtis used the phrase "At the NFL scouting combine in 2014, he ran the 40 in 4.91 seconds." *Id.* at 32. Curtis suspected this was plagiarism because he was able to use Google to find another article which included the same phrase. *Id.*

4

On May 28, 2015, Richards sent an email to Kurt Johnson, a senior vice-president for programming at Townsquare, stating they had "discover [sic] a case of plagiarism in the Killeen/Temple market." Resp. Mot. Summ. J. [#40-4] Ex. D at 40–41. Richards did not share Curtis's equivocations regarding whether or not Rivera's posts constituted plagiarism, instead informing Johnson that Curtis, Richards, and McMaster had concluded Rivera was actively engaged in plagiarism. *Id.*

On the same day, Johnson also received an email from Rivera himself, in which Rivera complained of discrimination at the radio station, including the directive that KOOC music artists pay for interviews. *Id.* at 39. Rivera believed this constituted discrimination because other stations were not required to charge their music artists for interviews. Rivera Decl. at 2–4. In spite of the concerns raised by Rivera in his email, Johnson left the role of reviewing Rivera's posts to Richards and two other managers. *Id.* [#40-5] Ex. E at 30–31.

Following a review by Richards and others, Rivera was informed on June 23, 2015 that he was being terminated for violating Townsquare's plagiarism policy. Mot. Summ. J. [#39-2] Appendix at 162. Townsquare then hired an African-American man, Shannon Brazier, to replace Rivera. *Id.* at 163–64.

In response to his termination, Rivera filed a complaint against Townsquare with the Texas Workforce Commission. Am. Compl. [#9] at 5. Rivera subsequently filed this suit in federal court alleging Townsquare's actions violated 42 U.S.C. §§ 2000e–2(a), 2000e–2(a), and 1981. *Id.* at 1. Townsquare now files a motion for summary judgment. Mot. Summ. J. [#39]. The motion is ripe for review.

## Analysis

### I. Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers*

*Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II. Application

Rivera brings a racial discrimination claim under 42 U.S.C. § 2000e–2(a) and retaliation claims under §§ 2000e–3(a) and 1981.[7] Discrimination and retaliation claims based on circumstantial evidence are reviewed under the *McDonnell Douglas* burden-shifting framework. *See Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (outlining element of prima facie case of discrimination); *see also Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (outlining elements of prima facie case of retaliation).

Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case by producing evidence in support of each element of the claim. *McKinsey*, 375 F.3d at 360 (noting burden is one of production, not persuasion). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate reason for the employer's action. *Id.*

---

[7] The analysis of Rivera's Title VII claims is equally applicable to Rivera's TCHRA claims, and as a result, the Court's analysis will not separately address Rivera's Title VII claims. *See Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) ("[T]he law governing claims under the TCHRA and Title VII is identical.").

7

Once the employer articulates a legitimate reason for the action, the burden then shifts back to the plaintiff to "demonstrate the employer's proffered explanation is unworthy of credence." *Id.* The plaintiff can meet this burden by either providing evidence of intentional discrimination or retaliation or by providing evidence establishing the falsity of the employer's explanation. *Id.*

### A. Racial Discrimination Claim

In order to state a prima facie claim for associational discrimination under § 2000e–2(a) and *McDonnell Douglas*, Rivera must show his associational discrimination claim is based directly or indirectly on Rivera's own race. *See Floyd v. Amite Cty. Sch. Dist.*, 581 F.3d 244, 249–51 (5th Cir. 2009) (holding associational discrimination claim must be based at least in part on the plaintiff's own race); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.*, 173 F.3d 988, 994–95 (6th Cir. 1999) (reading Title VII to prohibit discrimination based "directly or indirectly" on the plaintiff's race and holding plaintiff stated a claim by alleging discrimination based on the contrast in races between plaintiff and his daughter); *see generally* 42 U.S.C. § 2000e–2(a) (prohibiting employer discrimination against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin").

Rivera, a Hispanic male, alleges Townsquare discriminated against him for associating with black men at the radio station. Rivera's claim for racial discrimination fails because Rivera has failed to point to evidence indicating his associational discrimination claim has anything to do with *his* race. Rivera alleges Townsquare discriminated against black men and also discriminated against Rivera for associating with black men. Rivera Decl. at 2–4. However, though Rivera puts forward the conclusory allegation that his associational discrimination claim

8

implicates his Hispanic racial identity,[8] Rivera has not pointed to any evidence corroborating this claim. Instead, all of the evidence highlighted by Rivera indicates Townsquare's alleged racial animus was directed solely toward the black men Rivera associated with at the station. *See Floyd*, 581 F.3d at 249–50 (affirming dismissal of associational discrimination claim brought by coach fired for promoting joint program for white and black track athletes because the coach's racial discrimination claim had nothing to do with the coach's own race); *see also Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 63 (2006) (explaining § 2000e-2(a) "seeks to prevent injury to individuals based on who they are, *i.e.*, their status" while § 2000e-3(a) "seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct"). Because Rivera has not pointed to any evidence suggesting his associational discrimination claim implicates his own race in any way, the Court finds Rivera has failed to make out a prima facie case of discrimination under § 2000e–2(a).

B.  **Retaliation Claim**

To establish a prima facie case of retaliation under *McDonnell Douglas*, a plaintiff must first establish he engaged in a protected activity. *Wheat*, 811 F.3d at 705.

Rivera argues he engaged in a protected activity by opposing an unlawful employment practice. *See* 42 U.S.C. § 2000e–3(a) (making it unlawful for an employer to discriminate against an employee because the employee has opposed an "unlawful employment practice"); *Wheat*, 811 F.3d at 705. Specifically, Rivera argues he opposed an unlawful employment practice when he complained to Richards and Johnson that Townsquare was treating KOOC differently than

---

[8] *See* Am. Compl. [#9] at 5 ("Plaintiff was discriminated against based on his race, Hispanic, because he was associating with, or having relationships with, people of the Black (African-American) race."); Rivera Decl. at 4 ("The reason Rivera received no budget or less budget than the other radio stations that did not play Black music was because of his race (Hispanic) and the race of his listeners (Black Majority).").

other stations because of KOOC's relatively high proportion of black listeners and musical artists. Resp. Mot. Summ. J. [#40] at 17.

Rivera's race discrimination claim fails because Rivera has not pointed to facts indicating Townsquare engaged in an unlawful employment practice under § 2000e–3(a). *See id.* at 17. Though in some places Rivera suggests discrimination against KOOC is tantamount to discrimination against black listeners and music artists, Rivera fails to explain how discrimination against black listeners and music artists—who are not employed by Townsquare—might constitute an "unlawful employment practice" with respect to § 2000e–3(a). *See id.* at 7, 17. Further, to the extent Rivera has premised his retaliation claim upon the claim of associational discrimination examined above, his retaliation claim must fail. *See id.* (arguing summary judgment evidence demonstrates "causal link between Mr. Rivera's treatment and his association with African-Americans"); Section II.A. (finding Rivera's factual allegations do not give rise to associational discrimination or an "unlawful employment practice" under § 2000e–2(a)).

The Court concludes Rivera's retaliation claim under 42 U.S.C. § 2000e–3(a) fails because Rivera has not identified or explained how Townsquare engaged in an "unlawful employment practice" within the meaning of § 2000e–3(a).

C.  **Section 1981**

In addition to his § 2000e–3(a) retaliation claim, Rivera has also brought a retaliation claim under § 1981.[9] Under § 1981, it is unlawful to retaliate against an individual for attempting to vindicate the rights of others to make and enforce contracts. *See* 42 U.S.C. § 1981; *CBOCS*

---

[9] Unlike a retaliation claim under § 2000e–3(a), a retaliation claim brought under § 1981 does not require the plaintiff to identify an "unlawful employment practice." *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 455 (2008) (noting § 1981 encompasses both "employment-related claims" as well as "non-employment contracts" (emphasis omitted)).

*West, Inc. v. Humphries*, 553 U.S. 442, 455 (2008) (interpreting § 1981 to encompass retaliation claims).

Like Title VII claims, Section 1981 claims for retaliation are evaluated under the *McDonnell Douglas* framework. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (applying *McDonnell Douglas* framework to § 1981 claims), *superseded in part by statute*, Civil Rights Act of 1991, 105 Stat. 1071, as recognized in *CBOCS*, 553 U.S. at 455; *cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (applying *McDonnell Douglas* framework to § 1983 claims).

In assessing Rivera's § 1981 claim under the *McDonnell Douglas* framework, the Court first determines whether Rivera has made out a prima facie case under § 1981. The Court then assesses whether Townsquare has articulated some legitimate reason for the employer's action. Finally, the Court considers whether Rivera has Townsquare's proffered explanation is unworthy of credence.

### 1. Prima Facie Case

To establish a prima facie case of retaliation,[10] Rivera must establish (1) he engaged in protected activity; (2) his employer took a materially adverse action against him; and (3) a causal link exists between his protected activity and the adverse action. *Wheat*, 811 F.3d at 705. The parties do not dispute Townsquare took a materially adverse action against Rivera when it terminated his employment. The relevant questions are therefore whether Rivera engaged in a protected activity and whether a causal link exists between the protected activity and the adverse action.

---

[10] In addition to his retaliation claim under § 1981, Rivera also claims Townsquare interfered with *his* right to contract based on race. Resp. Mot. Summ. J. [#40] at 17. The Court finds this claim fails because Rivera has not pointed to any facts indicating Townsquare interfered with Rivera's right to contract in his personal capacity.

### a. Protected Activity

Rivera alleges he engaged in a protected activity by attempting to vindicate the rights of black music artists to make and enforce contracts. *See* 42 U.S.C. § 1981; *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (noting § 1981 protects the equal right of all persons to make and enforce contracts without respect to race). Specifically, Rivera argues he attempted to vindicate the rights of black music artists to make and enforce contracts when he complained to Townsquare about the "disparate treatment" KOOC was receiving and when he refused Wiederhold's directive that he charge black artists for playing their music or interviewing them on air. Resp. Mot. Summ. J. [#40] at 17–18.

For its part, Townsquare argues Rivera did not engage in a protected activity and suggests the rights he allegedly attempted to vindicate do not fall within the scope of § 1981. Specifically, Townsquare argues § 1981 is not implicated because the alleged refusal to allow black artists free airtime amounts to a denial of a gratuitous benefit, rather than interference with a right to contract. Mot. Summ. J. [#39] at 26.

The first question is whether Townsquare's alleged conduct implicates a right to make or enforce contracts. Any claim brought under § 1981 must identify an impaired contractual relationship under which the plaintiff has rights. *McDonald*, 546 U.S. at 476. However, the contractual relationship "need not already exist because § 1981 protects the would-be contractor along with those who have already made contracts." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 388 (5th Cir. 2017). Therefore, Rivera must point to evidence plausibly demonstrating that Townsquare's alleged discrimination concerned a prospective contract. Rivera has stated Wiederhold directed him to begin charging black artists for playing their music

and for interviewing them on air.[11] Rivera Decl. at 2–4. This contemplated arrangement qualifies as a matter of prospective contract entitled to protection under § 1981.

The second question is whether Rivera engaged in protected activity when he complained and refused to implement Wiederhold's order that he begin charging black artists for playing their music and interviews. Rivera argues he was attempting to vindicate the rights of black artists to make and enforce contracts with Townsquare on the same terms as other artists and points out Townsquare did not normally charge white artists for playing music or for interview. *See* Rivera Decl. at 3 ("Other people in the office who engaged in the same transactions with non-Black artists were not told that they had to charge their artists for the services in question.").

Viewing the summary judgment evidence in the light most favorable to Rivera, the Court finds a genuine issue of material fact exists as to whether Rivera engaged in protected activity when he complained Townsquare was treating black music artists differently than other artists by charging them for airtime and when he refused to implement Townsquare's directive.[12] *See Albert v. Varovano*, 851 F.2d 561, 572–73 (2d Cir. 1988) ("[P]laintiffs may bring an action under Section 1981 against one who has retaliated against them because they did *not* engage in purposeful racial discrimination in a contractual or marital context, or because they objected to the defendant's purposeful racial discrimination.").

### b. Causal Link

Under the third step of the *McDonnell Douglas* framework, Rivera must demonstrate a causal link between his protected activity and the adverse action taken by Townsquare. *Wheat*,

---

[11] Arguably, the relationship between the black music artists and Townsquare was contractual even before Townsquare instructed Rivera to charge black artists for radio time. *Cf. Barfield v. Commerce Bank, N.A.*, 484 F.3d 1276 (10th Cir. 2007) (noting profitable businesses often engage in loss-leading transactions and that such transactions do not necessarily lack consideration if they offer other indirect benefits to the business).

[12] Townsquare has argued only that its business relationship with music artists is not a matter of contract, and accordingly, the Court does not have occasion to consider other arguments regarding whether the conduct complained of falls within the ambit of § 1981.

13

811 F.3d at 706. To demonstrate a causal link between the protected activity and the adverse action, the plaintiff must "provide substantial evidence that 'but for' exercising protected rights," he would not have been discharged. *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. at 2533 (2013)).

Viewed in the light most favorable to Rivera, the Court determines there is substantial evidence creating a genuine issue of material fact as to whether Rivera would not have been discharged but-for his protected conduct.

At some point in early 2015, Rivera refused Wiederhold's directive that he begin charging black artists for playing their music and for interviews on air. Rivera Decl. at 3. Rivera alleges he refused to begin charging black artists because Townsquare did not charge white artists and he believed treating the artists differently would be illegal. *Id.* Above, the Court has determined this constituted protected conduct.

Also in early 2015, Rivera was called into a meeting with Tan Curtis, the digital managing editor, and Vince Richards, the operations manager. Mot. Summ. J. [#39-2] Appendix at 230. Curtis explained Rivera should include attribution and hyperlinks in his blog posts when he gathered information from outside sources and cautioned Rivera should add a local or personal spin when adapting posts written by Townsquare's national team. *Id.*; *see also id.* at 234 (explaining Rivera was "welcome to create [his] own posts based on content [he had] been made aware of through our national sites, especially if you have something personal or local to add to the conversation"). After the meeting, Curtis sent out an email stating "[o]ur concerns discussed, we look forward to a productive and creative 2015. *Id.* at 230. The email does not suggest Townsquare was considering terminating Rivera for the conduct addressed in the January 27 meeting.

14

In the months following the January 27 meeting, Curtis closely scrutinized Rivera's posts and identified four additional examples of "not exactly" plagiarism and misattribution. *Id.* [#39-3] Appendix at 28–34. In one of the May 2015 emails bringing the posts to the attention of management, Curtis explained Rivera's posts did not actually constitute plagiarism but probably violated Townsquare's "proper attribution protocols." *Id.* at 27. Curtis believed the posts showed Rivera was intent on "trying to find . . . ways around putting in the effort required to complete his regular posting duties." *Id.* at 19.

Upon receiving Curtis's May 2015 emails regarding Rivera's "sort of" plagiarism, Richards contacted Senior Vice President of Content Kurt Johnson and informed him Rivera had been caught plagiarizing. Resp. Mot. Summ. J. [#40-4] Ex. D at 40–41. Johnson—who also received a complaint from Rivera regarding local management's discriminatory treatment towards KOOC—eventually relayed the information he received to several other members of management and determined to fire Rivera for plagiarism. Mot. Summ. J. [#39-2] Appendix at 154. Johnson did not conduct an independent review into the allegations of plagiarism made by Richards—man who had previously told Rivera to "stop complaining" about Wiederhold's allegedly discriminatory management behavior. Rivera Decl. at 3–4; *cf. Gee v. Principi*, 289 F.3d 342, (5th Cir. 2002) ("[W]hen the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact"). Rivera was subsequently terminated for plagiarism in June 2015. Mot. Summ. J. [#39-2] Appendix at 162.

The relevant question is whether Rivera was fired because (a) he engaged in protected conduct and complained to Richards about Wiederhold's allegedly discriminatory treatment of

black music artists working with KOOC, or because (b) he continued to engage in plagiarism after the January 27 meeting.

In its motion for summary judgment, Townsquare points to three articles posted by Rivera following the January 27 meeting in which Rivera "commented on news already reported by other media sources"[13] without providing attribution. Mot. Summ. J. [#39] at 14. Townsquare suggests these posts, which by Curtis's own estimation were "not exactly" plagiarism, constituted the last straw precipitating Rivera's termination.

For his part, Rivera argues that he never engaged in plagiarism. Rivera Decl. at 4. Rivera argues Curtis and Richards conducted a singularly[14] extensive campaign to review hundreds of Rivera's posts in hopes of locating superficial similarities to other articles reporting on the same news event. Resp. Mot. Summ. J. [#40-1] Ex. A at 4. Rivera also points out, somewhat saliently, that the only clear-cut examples of "plagiarism" predated the January 27 meeting and involved Rivera adapting Townsquare's *own posts* for local use, a practice which had been explicitly condoned by management in the past and which Rivera ceased to engage in once Curtis began to clarify and narrow existing policy. *Compare* Feb. 5 Email (stating Rivera was "welcome" to appropriate content from national site posts), *with* Mot. Summ. J. [#39-2] Appendix at 242 (stating contributors should "never repurpose [n]ational content in place of local [content]" and informing contributors they must obtain prior authorization before putting a personal or local spin on content contained in national site posts).

---

[13] It is worth noting that nearly all of Rivera's posts likely fall into this category. The summary judgment evidence suggests Rivera—a hip-hop d.j.—probably lacked the resources necessary to try his hand at investigative reporting.

[14] Townsquare has not pointed to any evidence suggesting it subjected the work of other contributors to a targeted plagiarism review of the sort conducted upon Rivera.

16

It is not the Court's duty at the summary judgment stage to definitively determine which party's factual account is correct. In light of limited evidence of plagiarism following the January 27 meeting and in light of Townsquare's failure to point to any previous instance in which it has ever fired an employee for plagiarism (let alone misattribution), the Court concludes a genuine issue of material fact exists as to whether Rivera would have been fired but for his protected activity.

In summation, because Rivera has identified a protected activity which was arguably the but-for cause of his termination, the Court finds Rivera has made out a prima facie case of retaliation under *McDonnell Douglas*.

### 2.  Nondiscriminatory Reason

Because Rivera has made out a prima facie case of retaliation, the burden shifts to Townsquare to articulate a legitimate, nondiscriminatory reason for Rivera's discharge. As already explained above, Townsquare has argued, somewhat unconvincingly, that Rivera was terminated because ten of the six hundred posts authored by Rivera during his time at KOOC allegedly violated Townsquare's plagiarism and source attribution. This qualifies as a legitimate albeit weak justification for Rivera's termination.

### 3.  Unworthy of Credence

Because Townsquare has articulated a legitimate reason for Rivera's termination, the burden shifts back to the Rivera to "demonstrate the employer's proffered explanation is unworthy of credence." *Id.* The plaintiff can meet this burden by either providing evidence of intentional discrimination or retaliation or by providing evidence establishing the falsity of the employer's explanation. *Id.*

Rivera argues Townsquare's explanation is unworthy of credence for two reasons. First, as examined above in conjunction with the Court's analysis of but-for causation, Rivera argues his alleged infractions following the January 27 meeting with Curtis and Richards were too minor, even when viewed in the context of his prior record, to serve as credible grounds for termination. Rivera Decl. at 1–5. Second, and relatedly, Rivera argues the plagiarism review was initiated specifically because Townsquare was searching for a reason to fire Rivera. *Id.* On this point, Rivera notes Townsquare cannot identify a single instance in which it has ever previously fired any employee for plagiarism. Resp. Mot. Summ. J. [#40] at 15. In consideration of these arguments and the facts examined above with respect to but-for causation,[15] the Court determines a genuine issue of material fact exists as to whether Townsquare's reason for firing Rivera is worthy of credence.[16]

## Conclusion

The Court finds Rivera has failed to state a claim under either §§ 2000e–2(a) or 2000e–3(a) With respect to Rivera's claim under § 1981, the Court finds Rivera has met his burdens of production under *McDonnell Douglas* but concludes genuine issues of material fact exist as to (1) whether Rivera's protected conduct was the but-for cause of his termination and (2) whether Townsquare's articulated reason for Rivera's termination is worthy of credence.

---

[15] Necessarily, this analysis overlaps with the Court's foregoing analysis of but-for causation. *See, e.g.*, Reply Mot. Summ. J. [#41] at 7 (conflating but-for causation and scrutiny of employer's reason for terminating employment). Insofar as Townsquare can articulate a credible, legitimate, and nondiscriminatory reason for Rivera's firing, Rivera will have difficulty showing he would have remained employed but-for his protected activity. Conversely, to the extent there is a genuine issue of material fact as to whether Rivera's protected activity was a but-for cause of his termination, there is an increased likelihood a genuine issue of material fact exists as to whether Townsquare's articulated reason for firing Rivera is credible.

[16] *See, e.g. Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." (citations omitted)).

Accordingly,

IT IS ORDERED that Townsquare's Motion for Summary Judgment [#39] is GRANTED in part and DENIED in part as described in this opinion.

SIGNED this the 22nd day of February 2018.

/s/ Sam Sparks
SAM SPARKS
SENIOR UNITED STATES DISTRICT JUDGE